C. Furness Hately, Appellee, v. John W. Kiser, Appellant.

Gen. No. 15,627.

1. PARTNERSHIP—*what does not establish.* An interest in profits accruing through use of office space, etc., does not establish a partnership so as to require a joinder of a party having such interest as a plaintiff in an action in assumpsit.

2. BROKERS AND FACTORS—*ordinance requiring license construed.* A general ordinance of the city of Chicago requiring brokers to be licensed according to its terms, does not include a stock broker.

3. GAMBLING—*when transaction in stock does not violate statute.* In this case while no affirmative defense that the transaction in question was gambling in nature was made the plaintiff was put upon his proof to establish a legitimate transaction; *held,* under the evidence, that the legitimacy of the transaction *prima facie* appeared and that a recovery should be sustained.

Assumpsit. Appeal from the Municipal Court of Chicago; the Hon. JOHN W. HOUSTON, Judge, presiding. Heard in this court at the October term, 1909. Affirmed. Opinion filed June 29, 1911.

GREGORY, POPPENHUSEN & McNAB, for appellant; S. S. GREGORY, of counsel.

IRA C. WOOD, for appellee.

MR. PRESIDING JUSTICE BROWN delivered the opinion of the court.

Hately, the plaintiff below, the appellee here, on March 6, 1909, recovered a judgment in the Municipal Court of Chicago against John W. Kiser, the defendant below, the appellant here, for $5,836.43 and costs. This sum was the amount of a verdict rendered by a jury less a *remittitur* of $254.69 for some reason entered by the plaintiff before judgment was given on it.

To reverse this judgment this appeal has been prosecuted.

The cause involves a transaction in stocks, which stated according to the contention of the plaintiff as to what was proved at the trial, was this:

The defendant Kiser was a man of large affairs and resources living in Chicago, who frequently dealt through stock brokers in accordance with the usages and customs of business so conducted in stocks commonly bought and sold on the stock market for purposes of speculation as well as of investment. He had so traded prior to the transaction involved here through the well known stock brokerage houses of Finley Barrell & Co. and Bartlett, Frazier & Carrington of Chicago. While thus trading in stocks for speculation through Finley Barrell & Co. he became well acquainted with the plaintiff Hately, a young man then about twenty-seven years old, and connected with Finley Barrell & Co. as an employee or otherwise. This was in 1903. As Mr. Kiser was known to be a man of substantial fortune, a large line of credit was extended to him by Finley Barrell & Co.

Mr. Hately in 1903 or 1904 took up the stock brokerage business for himself, forming a partnership under the name of Geddes & Hately. Mr. Geddes did not remain long in the business, which became that solely of the plaintiff Hately in August 15, 1905, and was afterward conducted under the name of Furness Hately & Co. Hately and Kiser were members of the same Club and met there and upon the street occasionally. Hately informed Kiser that he was in business

for himself and solicited an order from him. In the latter part of 1904 Kiser gave Hately an order to buy 200 shares of Chicago, Milwaukee and St. Paul stock at a given price, and it was bought at that price and "carried" by Geddes & Hately until August 9, 1905, when apparently by the order of Kiser it was sold. No money was put up as margin by Kiser on this transaction nor payment made on account of the business nor for carrying the stock, nor did Hately ask for any. On the 9th of August, 1905, however, the sale of the stock produced a profit which left to the credit of Kiser with Hately after all the customary charges (as may be presumed) were deducted, $1,285.63, which at Kiser's request was sent by check to him. In the meantime one other transaction took place within the compass of a day. On December 8, 1904, at the order of Kiser, Hately bought for him 100 shares of Union Pacific stock at 108 and sold it, likewise at Kiser's order, at 109. No money was paid as margin on this transaction, but it would appear that whatever small amount may have been left to Kiser's credit out of the profit after the ordinary commissions were charged against him so remained to his credit during the pendency of the deal in Milwaukee and St. Paul stock, and was finally included in the check of $1,285.63 which was sent to him September 28, 1905. That was then the amount of his balance, and Hately says he never had at any time any occasion to pay Kiser any other money.

Trade letters such as stock and grain brokers' offices are accustomed to send out were sent by Hately to Kiser after September 28th and before December 5, 1905. December 5th Mr. Kiser called Mr. Hately on the telephone, told him that he had received one of these letters containing advice on the subject of "Nickel Plate" stock (the name given the stock of the New York, Chicago & St. Louis Railroad), and asked if he would still advise the purchase of it. Hately replied in the negative and recommended the purchase of International Mercantile Marine Preferred stock, which had been a rather inactive stock at about 36 for some time. Whereupon Kiser told Hately to buy 200 shares for him and let him know by telephone when the order was executed. Hately

bought the stock through the stock exchange or brokerage
house of Bartlett, Frazier & Carrington, which had an office
in Chicago and held a membership in the New York Stock
Exchange, which Hately did not.

The International Mercantile Marine stock was not then
listed on the New York Stock Exchange and was known,
therefore, as a "curb" stock, because it could not be traded in
on the Exchange, but was bought and sold on the street in
New York near the Exchange with other stocks not so listed.
The brokers who trade in these stocks, however, represent
reputable stock exchange houses, and the transactions there
which fix the market price are reported as news in the finan-
cial journals and daily newspapers. Kiser put up no margin
with Hately and was asked for none by him, but Hately, as
we read his testimony, says that contemporaneously with the
order to Bartlett, Frazier & Carrington, or shortly subsequent
thereto, he sent Bartlett, Frazier & Carrington a margin for a
portion of the price, 100 shares at 35¾ and 100 shares at 35⅞.
However that may be, Bartlett, Frazier & Carrington reported
to Hately within a few minutes that they had bought the
stock in question at said price, and Hately reported the same
by telephone to Kiser, and afterward on that date sent through
the mail to Mr. Kiser a letter of advice stating the transaction
as follows:

"Chicago, December 5, 1905.

J. W. Kiser,
   Dear Sir: We have this day bought for your account and
risk according to the rules of the New York Stock Exchange,
   100 International Mercantile Marine Pfd., 35¾.
   100 International Mercantile Marine Pfd., 35⅞.
   This account received by telegraph.
*     *     *     *     *     *     *     *     *     *
                         Respectfully yours,
                              Furness Hately & Co."

Shortly afterward, but later than January 12, 1906, Hately
and Kiser met accidentally at their club, and spoke about the
transaction, in which conversation Kiser told Hately that if

there was "ever a profit in it" (the stock) "over and above commissions and interest," he was to sell it out. At various indefinite times thereafter, in incidental meetings, Kiser and Hately spoke together about the stock and the transaction. "It came up as a natural topic of conversation," Hately says. Hately did not receive from Bartlett, Frazier & Carrington the certificates of stock, but from the fifth day of December, 1905, to the 14th day of November, 1907, Bartlett, Frazier & Carrington had possession of them subject to the order of the plaintiff and for his account. Hately did not call on Kiser for "margin" or "carrying charges" or money for any other purpose until October, 1907. During the time between January 12, 1906, and November 14, 1907, the stock never reached a price on the market at which it could have been sold without a loss to Kiser.

In October, 1907, Hately wrote Kiser demanding $5,000 as "margin" or security on the transaction, and later in November wrote him two more letters, one requesting him to take the stock up or settle for it, and one on November 7th as follows:

"As we are going out of the stock business immediately please instruct what house we shall deliver your Int. Mer. Marine 200 pfd. shares to and oblige,

Yours very truly,
Furness Hately & Co."

Hately received no answers to these three letters, but after some ineffectual efforts he reached Kiser over the telephone November 14, 1907, and asked for such an answer. Kiser then asserted that he had no transaction with Hately in the stock involved and had never had such stock bought or carried for his account. Hately replied over the telephone to Kiser that he would "sell him out," and gave orders to Bartlett, Frazier & Carrington to sell for his account the 200 shares of International Mercantile Marine which they held for him on his order of December 5, 1905. This Bartlett, Frazier & Carrington did at the market price of 11½. They gave Hately credit for the margin which he had paid them and for the

amount received for the stock, which must have been $2,300, and deducting these credits from the price at which they bought (which was $7,162.50) plus interest on the debit balance which had remained on their books on their advances and commissions, called on him for the balance due them, which he paid. Neither the amount of the margin advanced by Hately nor of this balance seems in the evidence to be specifically named, but together by computation they must have amounted to $4,862.50 plus the interest and commissions which they charged. The record seems to us singularly lacking in precise figures showing what that interest and commissions or charges were, but so far as Hately's charges for advances against Kiser went they would seem from the evidence properly to be (assuming that those matters were proven which Hately contends were proven) the amount of the price at which the stock was bought on December 5, 1905, with proper interest on that amount of $7,162.50 to November 14, 1907, when it was sold, and on the balance then shown after the amount of $2,300 realized on the sale was deducted, to the date of the verdict. This would account for the amount of the judgment, which may properly, we think, be assumed to be equaled by the advances shown by the evidence to have been made by Hately on account of this "deal," without addition of broker's charges for commissions. This fact is important in some views of the law applicable to this controversy which might be taken.

Kiser refused to acknowledge any liability in connection with these transactions, and Hately brought a suit of the first class in assumpsit in the Municipal Court against him, putting the *ad damnum* at $7,000, and attached to the declaration an affidavit that the demand was for money due from the defendant to the plaintiff for the purchase and sale of 200 shares of the preferred capital stock of the International Mercantile Marine Steamship Company, and that the amount due was $5,973.20, with interest from November 15, 1907.

The declaration itself contained two special counts and the consolidated common counts. The special counts claimed from the defendant the amount at which the stock was alleged

to be bought for him with brokerage fees and interest "according to the custom of the Chicago Stock Exchange of the city of Chicago." The common counts contained of course the usual counts for money laid out and expended for the defendant at his request.

The defendant first pleaded the general issue with an affidavit of defense denying that he ever entered into any engagement whatever with the plaintiff in respect to the stock mentioned in the plaintiff's declaration. Subsequently, on leave granted by the court, the defendant filed an additional plea to the special counts of the declaration, averring that the plaintiff at the time of the transactions alleged in the said counts of the declaration "was engaged in the business of a stock broker in the city of Chicago aforesaid relative to property with the custody of which he had no concern and as such and in that capacity and not otherwise acted in respect of each and all of the matters and things in said two counts of his said declaration therein respectively stated and that the said plaintiff did not at any time prior to the said 5th day of December, A. D. 1905, nor at any time thereafter, obtain a license from the city of Chicago authorizing or permitting him to engage in the business or act in the capacity of a broker."

Before the case was submitted to a jury a demurrer filed by the plaintiff to this additional plea was overruled. The plaintiff then amended the special counts before set forth by verbal changes which substituted "agent" and "agents' fees" for "broker" and "brokerage fees," and eliminated reference to the custom of brokers or of the stock exchange. The general issue and the additional plea were ordered to stand to the amended counts, and the plaintiff filed a replication to the additional plea, which replication traversed the allegation of the plea that the plaintiff was engaged and acting in the matters described in the declaration in the business of a broker relating to property with the custody of which he had no concern, alleged that he was on the contrary so acting with reference to property with the custody of which he had concern and control, and concluded to the country.

The case was submitted to a jury, which, as before recited, found the issues for the plaintiff and assessed the plaintiff's damages at $6,091.12, which counsel for appellee in his argument says made no allowance for commissions or other charges, but was for the amount expended or advanced by the plaintiff for the defendant, with interest charges thereon, less the sum received on the sale of the stock. This assertion is not questioned by counsel for appellant, and is borne out by computation. It may therefore be assumed as an admitted fact in the cause.

A *remittitur* for $254.09 was entered by the plaintiff and judgment given, as before stated, for $5,836.43.

This judgment the appellant, under the assignments of error made and argued, attacks on several grounds; which we shall separately consider.

He first says that even assuming to be proven the state of facts which we have set forth as alleged by the plaintiff, the judgment cannot as a matter of law be maintained, because the evidence also shows a nonjoinder of a necessary plaintiff. One Thomas E. Wells was interested, he maintains, in the profits of the plaintiff's business in such a way as to make him a partner therein and a necessary party to this suit. During the time of these transactions it appears by an answer of the plaintiff to interrogatories filed by the defendant and in the testimony of plaintiff that "Wells was interested in the profits of the business conducted by plaintiff." But it also appears by the testimony of the plaintiff that this share or interest in the profits was paid "for office space and for service of Wells' office force in taking care of plaintiff's bookkeeping." There is no other evidence on the matter, and we think that the share in the profits must be held to have been merely compensation for services and the use of property in the business, and therefore not by itself to establish a partnership. Fougner v. First Nat'l Bank, 141 Ill. 124. Irrespective, therefore, of any question of pleading, we do not think a nonjoinder was established in the cause.

The defendant also maintains that even if the jury had been justified in believing the transactions to have been

proven as before set forth in the statement of plaintiff's contentions, they should not have found a verdict for the plaintiff, because it also appeared by stipulation in the cause that "at the times in the declaration referred to and since the plaintiff had no license from the city of Chicago as a broker." Therefore, it is maintained, the plaintiff was, according to his own testimony, engaged in an illegal transaction through which he acquired no standing to recover from the defendant at law either commission and brokerage charges (which are not now in controversy) or damages from the defendant in respect of his breach of the contract with him, which was involved in those transactions.

This position is carefully distinguished by the defendant from any claim that the transaction alleged was void as a gambling transaction involving nothing but wagers on the market, and therefore illegal and void under the statutes or at common law. Such a view of the matter is disclaimed—a disclaimer that we shall hereafter have occasion to advert to. The illegality which forbids the recovery of the advances and expenditures made in this matter by the plaintiff, on the authority and request, as it is contended, of the defendant, lies, according to the defendant's contention, in the fact that the business in which they were made was in contravention of a general ordinance of the city of Chicago, of which the Municipal Court took judicial notice and of which we therefore, in reviewing the action of that court, also take judicial notice.

The ordinance in question is chapter xiv. of the Revised Municipal Code of Chicago of 1905. The entire chapter is concerning "Brokers." The provisions asserted to be directly applicable to the matter herein involved are as follows:

"*Section 192.* It shall be unlawful for any person or corporation to engage in the business or act in the capacity of a broker within the city without first obtaining a license therefor."

"*Section 194.* A broker is one who is engaged for others in negotiating contracts relative to property with the custody of which he has no conecrn."

Two other sections of the chapter define "A Real Estate Broker" and an "Insurance Broker." The remainder of the chapter provides how application for a license may be made and names a fee to be paid therefor, indicates what must be done in case of a change of location in a place of business of a licensee, makes employees of a licensed broker acting as brokers amenable to the Act, and concludes with a provision that "Any person or corporation violating any of the provisions of this chapter shall be fined not less than twenty-five dollars nor more than two hundred dollars for each offense."

The two questions that are presented by this contention are, first, whether the plaintiff in the transactions involved was a broker under the definition of this ordinance, and, secondly, if he were, whether the advances and expenditures made by him for the defendant in the course of them must fall with the compensation for his services because of the illegality of his conducting an unlicensed business.

In the view which we take of the first of these questions, the second may be said to be academic merely in this case; but as the answer to each has been thought by us to be properly found in the peculiar relations of a person doing the business commonly known as "stock brokerage" to his customers or clients, we shall make allusion to two diverse theories to be found in the authoritative cases on the subject, noting their bearing upon both the questions as a double justification of our decision that the ordinance is not a bar to the recovery herein sought. It is clear to us that the use of the word "broker" or "stockbroker" to characterize a man engaged in the business of buying and selling "stocks" on "margins" or otherwise, according to the usage and custom of stock exchanges which exist in all important business centers, although practically at least universal, does not by itself, in view of the provisions of the ordinance as a whole fix on such a man obligations and liabilities under it. Did section 192 stand by itself, however, that might well be claimed. The word "broker" would then perhaps be properly referred for definition to the common speech of people. But the ordinance in subse-

quent sections, by first defining a "broker" and then giving other definitions of "a real estate broker" and "an insurance broker," differing from the first, shows the evident intention to make only those persons who conformed to one or another of these three definite descriptions liable to its restrictions and penalties. Persons therefore commonly called brokers who do not fall within one of the three descriptions are not amenable to them.

This seems the plainer when the prior ordinances concerning brokers, superseded by this one on March 20, 1905, and the decisions of the Supreme Court under them are considered. By the ordinance in force before 1897 "money changers," "bankers," "brokers," "commission merchants," "merchandise, produce or grain brokers," "real estate brokers" and "insurance brokers" were lumped together as requiring a license, and "a merchandise, produce or grain broker" was defined as one "who for commission or other compensation is engaged in selling or negotiating the sale of goods, wares, merchandise, produce or grain belonging to others."

In 1879 the council passed a new ordinance which made the class of persons of this kind requiring a license only "brokers, including real estate brokers and insurance brokers." The definitions of real estate and insurance brokers in this ordinance of 1897 do not differ practically from those in the present ordinance, but a "broker" generally is defined to be "one who for commission or other compensation is engaged in selling or negotiating the sale of goods, wares, merchandise, produce or grain *belonging to others.*" This definition was precisely that given to "merchandise, produce or grain brokers" by the ordinance preceding.

Counsel for appellant has argued that the city council in 1905 showed an intent by including persons negotiating purchases as well as sales to enlarge the class of "brokers" subject to the two preceding license ordinances. However that may be, it certainly most materially changed, narrowed and limited it in another direction.

The Supreme Court, through Judge Walker, in Braun v. The City of Chicago, in 1884, 110 Ill. 186, in which it was

argued that the legislature had never empowered the city to require licenses from commission merchants and real estate agents, had held that this was immaterial because the appellants in that case fell within the "precise technical meaning of the term brokers" as defined by lexicographers of high authority, namely, those who are "engaged for others in negotiating contracts relative to property with the custody of which they have no concern." Later (in 1898) the Supreme Court (speaking by Judge Boggs) having under the ordinance of 1897 an appeal from a judgment enforcing it against a stockbroker, a member of the Chicago Stock Exchange, notes this definition of a "broker" as one narrower than that accepted at the present day, and to establish this proposition points out that persons attending to the purchase and sale of stocks are now called "brokers" and yet are (quoting with approbation from the American and English Encyclopaedia of Law) 'frequently entrusted with the possession of the securities, and may even take and transfer them without the name of their principals appearing in the transaction and often pay or advance the price and receive payment.' Therefore, says Mr. Justice Boggs, the stockbroker may exercise some of the functions of a factor or of a banker and be none the less a broker, and "it is believed the meaning *now* most usually given *in common acceptation* to the word broker is one who transacts the business in which it appears from the stipulated facts the appellant is engaged." Banta v. The City of Chicago, 172 Ill. 204.

When after these decisions the city council repealed the ordinance which defined the term "broker" as describing one "engaged for commission or other compensation" in selling or negotiating the sale of goods, wares, merchandise, produce or grain *belonging to others,* and substituting one which defined a broker according to a "narrower description than that accepted at the present day," and one which the Supreme Court had impliedly conceded would *not* cover "stockbrokers," it is reasonable to presume that it designed to exclude them from the operation of the ordinance, or at least not to hold

them liable because of their coming, in ordinary speech, under the denomination of "brokers."

But the inquiry remains to be made whether a stockbroker engaged in transactions like the plaintiff's in the case at bar, *is* "engaged for others in negotiating contracts relative to property with the custody of which he has no concern."

Two views have been taken by the courts of the relations of stockbrokers to their customers, or clients, in transactions like the one involved here, where stocks are by such customer or client ordered bought for his account by a stockbroker, not for investment but to be "carried" and sold again at some future time with the hope of a rise. The one has been expressly adopted by the courts of Massachusetts; the other adopted by the courts of New York and by the Supreme Court of the United States, and, we think, assumed at least by the Supreme Court of Illinois to obtain in this jurisdiction. By the Massachusetts view, the contract between the stockbroker and his customer is purely a contractual one. The broker agrees by it to deliver on demand to his customers so many shares of stock on payment of the remainder of the purchase price where a margin has been put up, and of the whole where it has not. Meanwhile, "There is no obligation resting on the broker to buy shares in the first instance or even to refrain from disposing of them during the existence of the contract so long as he delivers them when the customer tenders the money and demands performance." (The language of Judge Lowell in the U. S. District Court in Massachusetts in In re Swift, 105 Fed. Rep. 493). This Massachusetts doctrine (and it is the English doctrine—Bentinck v. London Joint Stock Bank, L. R. 1893, 2 Ch. 120) expressly repudiating the theory of "pledgor and pledgee" adopted by the courts of New York since the leading case of Markham v. Joudan, 41 N. Y. 235, is laid down in Wood v. Hayes, 15 Gray, 375, Covell v. Loud, 135 Mass. 41, Weston v. Jordan, 168 Mass. 401, Chase v. Boston, 180 Mass. 458, and probably in other cases. Referring to it Mr. Justice Holmes in his concurring opinion in Richardson v. Shaw, 209 U. S. 365, says: "If I had been left to decide this case alone I should have adhered to the

opinion which, upon authority and conviction, I helped to enforce in another place.  *  *  *  A just deference to the views of my brethren prevents my dissenting from the conclusion reached, although I cannot but feel a lingering doubt."

If this were the doctrine of Illinois, it certainly could not be contended that the stockbroker having the relation which Hately contends it was proven he had with Kiser was a "broker" under the definition of the ordinances—"one who is engaged for others in negotiating contracts relative to property with the custody of which he has no concern." It is plain that he would be one who had agreed on demand, on condition of a certain payment to be made, to deliver stock which must be at that time his own and with the custody of which he would have the greatest possible "concern."

We have, however, alluded to this Massachusetts and English doctrine chiefly to compare it with the more commonly received doctrine in this country laid down in Markham v. Jaudon and Richardson v. Shaw; for though not explicitly choosing between the two views, Brewster v. Van Liew, 119 Ill. 554, followed by us in Schaefer v. Dickinson, 141 Ill. App. 234, may be assumed to have shown that in Illinois the doctrine of those cases is the doctrine obtaining in this State. That doctrine is this, as expressed in Markham v. Jaudon by Chief Justice Hunt: The contract between the broker and the customer compels the broker to buy for the customer the stocks indicated, *to advance the money required for the purchase,* to carry or hold the stocks for the benefit of the customer, *to have in his name or under his control ready for delivery the shares purchased or an equal amount of other shares* of the said stock, and to deliver such shares to the customer when required by him upon the receipt of the advance and commissions accruing to the broker, or to sell such shares upon the order of the customer and account to the customer for the proceeds. The customer's obligation is to take the shares so purchased on his order whenever required by the broker and pay the amount advanced by the broker.

Says the learned Chief Justice, developing the theory to which these elements in the contract lead:

"The position of the broker is twofold. Upon the order of the customer, he purchases the shares of stock desired by him. This is a clear act of agency. To complete the purchase" (in this case ten per cent of the price had been put up with the broker as margin) "he advances from his own funds, for the benefit of the customer, ninety per cent of the purchase money. Quite as clearly he does *not* in *this* act as an agent, but assumes a new position. He also holds or carries the stock for the benefit of the purchaser until a sale is made by the order of the purchaser or upon his own action. *In thus holding or carrying, he stands also upon a different ground from that of a broker or agent, whose office is simply to buy or sell. To advance money for the purchase and to hold and carry stock is not the act of a broker as such. In so doing he enters upon a new duty, obtains other rights and is subject to additional responsibilities.*" (The italics are of course ours.)

The Chief Justice therefore concludes: "While it is true that the dealer" (the customer) "in the present case never had actual possession of the property which he claims to have pledged, he had it sufficiently to bring his case within the principles of the law of pledge. The substance of the first branch of the transaction is this: The plaintiff calls upon the defendants, who are brokers, to purchase for him certain shares of railroad stock and furnishes him with $1,000 for that purpose, agreeing to pay interest on advances he shall make in the purchase and commissions. The defendants make the purchase, having themselves advanced ninety per cent of the purchase money. They bring to the plaintiff the certificates of the stock thus purchased by him and for him and deliver them to him as the owner thereof. He thereupon hands them back to the defendants to hold as security for their advance on the purchase with interest and commissions. If these precise forms had been observed, no one would deny that the redelivery of the certificates would have constituted a strict formal pledge. In my opinion the transaction as it took place amounted to the same thing. To have delivered the certificates to the plaintiff and that the plaintiff should then

have returned them to the defendants to be held by them as security for the advance in their purchase, would leave the parties in precisely the same situation as if the defendants had retained them for that purpose. The form of a delivery to the plaintiff and a redelivery by him to the defendants being waived by agreement of the parties, it comes fully within the principles I have already quoted from Story on Bailments that where the pledgee has the thing in his possession the contract of pledge operates as a delivery the moment the contract is completed. The certificates are appropriated as security for an engagement, to-wit, the payment of the advance with interest and commissions. *The possession and the delivery are complete in the abbreviated manner I have described.*"

The theory of a pledge and the constructive delivery and redelivery of the stock pledge, and of a "repledge" by the first "broker" in such a case as the present, where the "broker" first dealt with buys through another who holds for him during the pendency of the "deal," has been accepted as the vital gist of Markham v. Jaudon wherever that case has been followed.

In Richardson v. Shaw (supra) Mr. Justice Day of the Supreme Court of the United States quotes much that we have repeated from Judge Hunt's opinion, and adopts the theory outlined by it and approves the statement that we have italicized, that in "holding and carrying" the *"stock* broker," in the usual line of his business, is something different from a broker or agent to buy and sell.

Under the accepted doctrine of Markham v. Jaudon concerning a stock broker's relations to his customers, therefore, as well as under that held by the Massachusetts courts, it is impossible to say that in some of them arising from dealings like those alleged herein, he is merely "one who is engaged for others in negotiating contracts relative to property with the custody of which he has no concern." As pledgee (and as repledgor, if he be one) he has an urgent concern with such custody. If the contract between him and his customer be entire and indivisible, then certainly he is not a "broker"

under the definition of the ordinance. If there be two contracts between him and his customer implied in the transactions and relations, which contracts may be separated in the eye of the law, why, notwithstanding the ordinance, may not the advances which he has made for his customer, not as "a broker," but under the new duties, rights and responsibilities, of which the New York Court of Appeals and the U. S. Supreme Court speak, logically be recovered, although his compensation for buying and selling cannot?

But as we have said, we deem this question academic in the present discussion and therefore do not think it necessary to refer to cases cited by counsel in argument which may seem to answer it in a negative sense. We agree with the contention of the appellant that the contract, if there was one, between Hately and Kiser was single and entire, and involved indivisibly all the relations usually in the course of such business existing between a "stockbroker," as that term is usually understood, and one who orders stock purchased for his account for speculation, or "to carry;" but we also hold that Hately was not subject to the licensing ordinance in question, and that the contract was not made illegal by his failure to hold a license.

We are thus brought to the contentions of the defendant on the evidence. In the first place, there is a direct contradiction by the defendant of the allegation that the order of purchase was ever given. The defendant repudiates the entire transaction, and for him it is argued that the transaction as alleged by the plaintiff is improbable in itself, and that the testimony of the plaintiff is weakened, not only by this inherent improbability, but by evidence of a faulty memory on collateral matters. Of the question thus involved it is only necessary for us to say that we think, after a study of the record, that it was for the jury to answer. It was one of the credibility of witnesses and of the effect of concurrent facts, and we do not feel that the answer inhering in the verdict of the jury is one which we are justified in setting aside. Peaslee v. Glass, 61 Ill. 94, and cases in this court in which language from that case has been quoted are cited to us, as

they often are in support of the position that where plaintiff and defendant directly contradict each other without corroboration on either side on the essential basis of a case, there can be no preponderance of evidence sufficient to justify a verdict for the plaintiff, which should consequently be set aside. Whatever may have been at any time said in opinions of this court applied to the facts of the particular case, it is clear that neither the decision in Peaslee v. Glass, nor even the dictum of the learned judge who wrote the opinion, is ground for the declaration of any such universal rule. We still hold, as Judge McAllister said in Herring v. Poritz, 6 Ill. App. 208: "It will not do to say as a matter of law that there can be no preponderance of the evidence in favor of the party holding the affirmative when there are but two" (opposed) "witnesses upon the facts in issue."

The defendant, however, maintains that even if the decision of the jury can stand as to his giving of the order to purchase, there is no competent evidence in the record to show that it was carried out, and the jury should have been instructed on this ground to return a verdict for the defendant. Although it is admitted that the plaintiff himself testified that the order was executed in New York, through the agency of Bartlett, Frazier & Carrington, and not denied that the transactions relating to the stock between the plaintiff and Bartlett, Frazier & Carrington took the course that such a purchase would involve, resulting in the payment by the plaintiff to Bartlett, Frazier & Carrington on account of them of the monies for which he has now obtained a judgment against Kiser, yet it is urged that by his own admission this testimony of Hately's must be hearsay and therefore incompetent, and that it was proven that he never himself had the certificates of the stock in his actual custody, nor ever saw them, and knew the fact that Bartlett, Frazier & Carrington had bought them only by their report to him, which he accepted as correct.

The point is not affirmatively made that the transaction between Hately and Bartlett, Frazier & Carrington was a gambling one, or that the trade was, in the language of the

Stock Exchanges, "bucket shopped"—that is, that Bartlett, Frazier & Carrington merely made book entries as though they had executed an order as they reported they had done, and by those entries, based on current market prices at the dates of the orders to them to buy and sell, had shown a debit of several thousand dollars to Hately, but it is claimed that it is not *admitted* that the stock was bought by Bartlett, Frazier & Carrington or otherwise for Hately, and that it rests on him so to prove and that without that proof, evidence that he paid Bartlett, Frazier & Carrington the money he is now seeking to recover from Kiser does not give him a right to judgment against Kiser. This is equivalent to saying, it seems to us, that although the defendant does not charge that the order to Bartlett, Frazier & Carrington was "bucket shopped," he does not admit that it was not, and it is for the plaintiff to prove that it was not. For, it being admitted that there was competent evidence that Bartlett, Frazier & Carrington reported the making of the purchase to Hately and charged and took from Hately over five thousand dollars on the assumption by him that that report was truthful and that they had in their posssession "carrying" for him the actual certificates of the stock involved from December, 1905, to November 14, 1907, and had then sold them for his account and on his order, there is no theory of the matter possible except that Bartlett, Frazier & Carrington actually carried the stock as reported, or "bucket shopped" the trade. If they did not do one, they must have done the other.

The question in a sense under the evidence in this case becomes one of the burden of proof, or, more accurately, whether the evidence which the plaintiff offered and which was admitted, with all the legitimate and reasonable inferences and intendments which might be drawn from it, made a *prima facie* case for the proposition that the stock in question, was, as the result of Hately's action through Bartlett, Frazier & Carrington, brought within the power and control of Hately to deliver to Kiser at all times between December 5, 1905, and November 14, 1907, on Kiser's demand and payment of the amount that would have been due.

If the stock was thus brought into that situation, the order of Kiser as interpreted by the customs and usages of the business as they appear in this record, was carried out, and Hately should not be left without recourse for the money which he advanced. This question cannot, in our view, be considered simply and purely a case of agency and subagency to buy a specific chattel. The peculiar character of the business, so well illustrated by the very theories adopted by the courts as before set out, to justify their views concerning the "holding and carrying," "the pledge and repledge," the "abbreviated" "possession and delivery," cannot and should not be entirely ignored in dealing with it.

Under those usages and customs (which the evidence tended to prove Kiser was familiar with) the suggestion of an estoppel against his denial of such a purchase having been made, is not without force. Hately did not see the certificates of stock that were bought, because he left them in pledge with Bartlett, Frazier & Carrington. Kiser did not see them because he left them in pledge with Hately. Kiser, it is to be presumed, knew of the necessity of Hately's buying such stock through others and of the custom and usage of the second pledge, but although (as we must assume the jury found) he was notified by telephone and written notice of the purchase on December 5th, and although he had several conversations with the plaintiff regarding the same and ordered him to sell upon a certain event, he raised no question of the purchase having been actually made nor any suggestion that it would be questioned. It was in consequence, it might be argued, that Hately raised and suspected none when he paid in the usual course of the business, as the agent and on account of his principal, the money which he is now endeavoring to collect from him.

But there are other stronger reasons, to our mind, for the conclusion which we have reached, that in the absence of any evidence to the contrary, offered or suggested by the defendant, the jury were justified in holding that Kiser's order had been properly executed by Hately through Bartlett, Frazier

& Carrington, according to the usages and customs of the business.

Under the statute the following among other interrogatories were addressed to Hately in behalf of the defendant before the trial:

"Eighth. When and by whom was that order executed? Was it given to another firm of brokers to be executed? If so, to whom, and why did you not make the trade yourself?

"Ninth. Did you on the 5th day of December, A. D. 1905, or at any time subsequent thereto, and if so, when, receive from anybody a certificate or certificates for two hundred shares of the Preferred stock of the International Mercantile Marine Steamship Company to hold for the said defendant? If so, from whom? What did you do with the said stock? Where was it kept prior to the said 15th day of November, 1907, and what then was done therewith?"

To these interrogatories the defendant answered by the proper writing filed in the cause:

"The plaintiff ordered Bartlett, Frazier & Carrington to purchase said 200 shares of the preferred capital stock of the International Mercantile Marine Steamship Company, which order was executed and said Bartlett, Frazier & Carrington did on the said 5th day of December, 1905, purchase said shares of stock and hold the same for the plaintiff subject to his order. This transaction took place through Bartlett, Frazier & Carrington because that firm had facilities for purchasing said stock in the City of New York.

"The plaintiff did not personally hold in his possession said certificates of shares of stock. From the 5th day of December, 1905, to the 14th day of November, 1907, they were in the possession of said Bartlett, Frazier & Carrington subject to the order of the plaintiff and for his account."

The Municipal Court Act in providing for these interrogatories also expressly provides that the party filing such

interrogatories shall not be *concluded* by the answers thereto, "if he shall elect to introduce the same or any or either of them upon the trial or final hearing."

The eighth interrogatory and answer was not offered by the defendant, but the last thing he did before resting his case, was to introduce the ninth interrogatory and the answer thereto, as follows:

*"The plaintiff did not personally hold in his possession said certificates of shares of stock. From the 5th day of December, 1905, to the 14th day of November, 1907, they were in the possession of said Bartlett, Frazier & Carrington subject to the order of the plaintiff and for his account."*

We are of opinion that under the customs and usages of the trade and the proper interpretation and construction of the contract made by Kiser with Hately when ordering him to purchase, if the certificates of shares in question were in the possession of said Bartlett, Frazier & Carrington "subject to the order of the plaintiff and for his account," the plaintiff is entitled to recover from Kiser what it cost him to bring about that result on account of Kiser's order. It made no difference to Kiser whether Hately had bought direct from Bartlett, Frazier & Carrington and "repledged" to them, or had bought through them and "repledged" to them, nor should it prevent his recovery here if it was the former and not the latter course which was adopted, of which, however, there is no evidence or suggestion. The defendant was not *"concluded"* by the answer to this ninth interrogatory certainly. He might contradict it by evidence offered, but does that mean it is to have no weight when he offers it in evidence (it being at his option to do so or not to do so), and nowhere attempts to contradict it? He cross-examined the plaintiff before offering this answer, and showed that the plaintiff never saw "the shares that he said he bought for Kiser." Counsel asked plaintiff: "Then you never had it in your actual personal custody?" To which the answer was, "No,

sir. It was carried for me by people who were acting as bankers really for me at that time in that way, just the same as I would carry it in my own bank." But there was nowhere any attempt or suggestion of an attempt on the part of the defendant to prove that the actual fact was not in accordance with the plaintiff's statement. We do not think that having himself secured this answer on cross-examination and offered thereafter the answer to the interrogatory alluded to and attempted no contradiction, he can now say that there was no evidence proper to go to the jury to prove the plaintiff's execution of the defendant's order. Taken in connection with the other evidence of what was done and said and heard in the offices of Bartlett, Frazier & Carrington and Furness Hately & Co. on the 5th of December, 1905, we think it made sufficient proof in the absence of any contradiction to warrant the jury in finding, if they believed that the order involved was given by Mr. Kiser, that it was executed.

The views that we have set forth necessarily involve the affirmance of the judgment of the Municipal Court.

*Affirmed.*